SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**JESSICA R. KEEFER, MSB # 1412180261**
Assistant United States Attorney
Jessica.Keefer@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:25-cr-00259-IM** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **ANTHONY BARRERA,** | |
| **Defendant.** | |

In May 2025, the defendant, Anthony Barrera, was intercepted driving approximately 270 pounds of methamphetamine and a kilogram of cocaine from Southern California to Oregon. During a law enforcement investigation into drug trafficking, the defendant had previously sold commercial quantities of methamphetamine on three occasions and was developed as a large-scale dealer suspect. This was the defendant's fourth trip to Southern California in 2025 to resupply himself with drugs. After his arrest, a search of the defendant's house uncovered two firearms that he initially admitted to receiving in drug deals despite being a convicted felon and on supervision

for a driving under the influence conviction. The government asks this Court to impose a sentence of 210-months, followed by five (5) years of supervised release.

**A. The Offense Conduct**

In March 2025, the Multnomah County Sheriff's Office Special Investigations Unit (MCSO SIU) and the Federal Bureau of Investigation (FBI) received information regarding a drug trafficker, later identified as the defendant, distributing commercial quantities of methamphetamine within the District of Oregon. Over the course of the investigation, investigators conducted three controlled buys of methamphetamine from the defendant. The quantities of methamphetamine involved in each of the controlled buys were distributable quantities not consistent with personal use.

Investigators obtained federal warrants for prospective and historical geolocation data from two phone numbers associated with the defendant. Historical geolocation data for one of the phone numbers revealed that the defendant had traveled to Southern California on three separate occasions in 2025. On May 21, 2025, investigators observed the GPS locations for the defendant's phones travel to Southern California. On May 22, 2025, investigators learned that the defendant had rented a Chevy Equinox from May 20 to May 27, 2025. On May 23 and 24, 2025, investigators obtained federal search warrants to search the defendant's residence and rental vehicle when the defendant reentered Oregon.

On May 24, 2025, investigators observed the defendant's GPS locations travel northbound from Southern California towards Oregon. After monitoring the defendant's GPS location throughout the day on May 24, 2025, members of SIU and the FBI drove to Southern Oregon. Later that day, investigators observed the defendant traveling northbound on I-5 in the Chevy Equinox. The defendant stopped at a rest area in Roseberg, Oregon, and investigators took him

into custody without incident. A search of the Chevy Equinox revealed approximately 1,047.2 grams of a substance that tested presumptively positive for cocaine and approximately 270 pounds of a substance that tested presumptively positive for methamphetamine. It was one of the largest drug seizures in MCSO SIU's history.





In addition, $2,860 in cash was seized from the defendant's wallet. Three cellphones were seized from the rental car. The defendant was Mirandized, waived his rights, and interviewed after his arrest. During the interview, the defendant estimated there were over 200 pounds of methamphetamine in the vehicle. The defendant said 20 pounds of the methamphetamine belonged to him and the remainder belonged to someone else. Initially, the defendant would not detail who

the remaining drugs were for or how the drugs would get to this person. The defendant later indicated that the 20 pounds were in lieu of a cash payment for his transportation of the drugs. The defendant admitted to law enforcement that he sold drugs to sustain a living. The defendant further admitted to traveling to Southern California to pick up the drugs, and he estimated that he had made the trip to resupply himself with drugs at least three times in 2025. The defendant told investigators there were two firearms at his residence in a hole in in his bedroom closet floor. Initially, the defendant said he had obtained both firearms from previous street drug deals and that he is a felon and should not have the firearms. Later, the defendant indicated that the firearms were only for protection and not obtained through drug dealing. A search of the defendant's residence revealed a revolver and a pistol under a removable piece of flooring in the defendant's bedroom closet, as the defendant indicated, as well as four gold bars which were later determined to be counterfeit. At the time of his arrest, the defendant was on supervision for a driving under the influence conviction in Multnomah County.

### B. The Charges

Defendant was charged by indictment on June 18, 2025, with one count of Possession with the Intent to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), one count of Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. §§ 841(a)(l) and (b)(l)(B), and one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(l).

### C. The Plea Agreement & Guideline Computations

Defendant pled guilty to one count of Possession with the Intent to Distribute Methamphetamine (Count 1) on March 10, 2026. Pursuant to the plea agreement, the government will dismiss the remaining counts at sentencing (Counts 2-3).

The parties agree with the following PSR computations:

| **Enhancement** | **Government's Position** |
|---|---|
| Base—<br>USSG § 2D1.1(a)(5) | 38 (not contested) |
| Possession of a Firearm – USSG § 2D1.1(b)(1) | +2 (not contested) |
| Acceptance of Responsibility—<br>USSG § 3E1.1 | -3 (not contested) |
| Offense Level | 37 (Reduced to 35 under 18 U.S.C. § 3553(a) on the government's recommendation) |
| Adjusted Offense Level | 35 |
| **Resulting Guideline Range** | **210– 262 months** |

The government, subject to the limitations set forth in the plea agreement, recommends that the defendant receive a three-level reduction for acceptance of responsibility. Further, the government recommends a two-level downward variance based on the defendant's early willingness to resolve this case under 18 U.S.C. § 3553(a). Because the defendant demonstrated an acceptance of responsibility, the government recommends, pursuant to the plea agreement, a sentence at the low end of the applicable guidelines (after the two-level variance) under the factors listed in 18 U.S.C. § 3553(a)).

After the adjustment for the possession of a firearm, the reduction for acceptance of responsibility and the downward variance for willingness to resolve the matter early, the adjusted offense level is 35. With a Criminal History Category of III, the applicable sentencing guideline range is 210 to 262 months' imprisonment.

Pursuant to the plea agreement, the defendant is seeking the ten-year mandatory minimum for the offense of conviction.

/ / /

**D. Government's Recommended Sentence**

The government asks the Court to impose a sentence of 210 months' imprisonment, to be followed by a five-year term of supervised release. Such a sentence is reasonable and warranted under the factors listed in 18 U.S.C. §3553(a). Given the sheer quantity of methamphetamine, the firearms defendant possessed, his dangerous criminal history, the fact that he committed this offense while on probation for a driving under the influence conviction, and the evidence indicating he was more than just a courier, a sentence below the advisory guidelines range is not appropriate under the 18 U.S.C. § 3553(a) factors.

The defendant transported approximately 270 pounds of methamphetamine and approximately a kilogram of cocaine. That is a massive amount of methamphetamine that would have ended up being sold in the community had law enforcement not interceded.

Methamphetamine is an incredibly addictive, destructive, and deadly drug that has been catastrophic for the community. While there has been a recent focus on the dangers of fentanyl, methamphetamine is a drug that has long devastated Oregon, resulting in deaths, crime, and adverse impacts on the livability of the community, and it continues to do so.

> Fentanyl and methamphetamine remain the primary threats, driving overdose deaths, impacting community livability, and contributing to drug related criminal activity. In 2025, fentanyl was involved in 68.7% of overdose deaths in Oregon and 38% in Idaho. Methamphetamine was present in 65.6% of Oregon overdose deaths and 38% in Idaho. Overdoses involving both drugs accounted for 44% of deaths in Oregon and 78% in Idaho.

Oregon-Idaho High Intensity Drug Trafficking Area (HIDTA) 2027 Threat Assessment at 5. Methamphetamine use is also frequently associated with other criminal activity, including property crimes. In Oregon and Idaho, methamphetamine "remains the most common drug involved in reported criminal cases." *Id.* at 17 (citing Oregon State Police – Uniform Crime Reporting Data –

Accessed 2/24/26. Unsurprisingly, the information and analytical center of Oregon-Idaho HIDTA "assesses that fentanyl, and methamphetamine will remain the region's most serious drug threats in 2027." *Id.* at 5.

Continued drug dealing—especially involving large, commercial quantities—represents a danger to the community. The defendant conducted multiple drug transactions of commercial quantities, not personal use quantities, during the investigation into him, prior to being stopped with the 270 pounds of methamphetamine on May 24, 2025. Beyond those buys and the May 24, 2025, seizure, the defendant admitted that he previously went to California at least three times that year to resupply himself. This is a continued, dangerous pattern of transporting and introducing a deadly drug into the community.

Regardless of whether the defendant was going to sell the seized 270 pounds of methamphetamine to a third party or would only sell the 20 pounds he asserts were set aside as payment, the drugs were still intended for sale and could have caused great harm to the community. Furthermore, even if the defendant intended only to keep and sell the 20 pounds of methamphetamine, that is still a significant quantity capable of community harm in and of itself. In the months just before his arrest, the defendant sold commercial quantities of drugs during controlled buys to a government source. The defendant was essential in getting drugs into the dealer's hands and then into the community. Ultimately, the community was impacted by both the defendant's transportation and his selling of drugs.

While the defendant's adult criminal convictions are limited and have not resulted in any significant periods of incarceration, he has an assaultive and dangerous history. In the last ten years, he has been arrested multiple times for assaultive conduct and driving while impaired, resulting in three convictions. PSR ¶¶ 41-51. The defendant has previous convictions for Attempt

to Commit Assault in the Fourth Degree, Burglary I, and Driving under the Influence. He was convicted in 2017 for assaulting the mother of his child in front of hospital security staff and had to be tazed before being arrested. PSR ¶ 41. The defendant had a blood alcohol concentration nearly twice the legal limit for driving. *Id.* The same year, he was convicted of burglary when he entered the mother of his child's home in violation of a no contact order and assaulted another person, resulting in stitches. PSR ¶ 42. In early 2025, he was convicted of driving under the influence of intoxicants after a vehicle crash where he drove off the road and into a ditch. PSR ¶ 43.

Although the defendant does not have any prior drug trafficking convictions, the geolocation data, physical surveillance, and the defendant's statements indicate that the conduct involved in defendant's arrest was not an isolated incident. He had made three previous trips in 2025 to Southern California to replenish his drug supply before he was arrested. Further, his role cannot be accurately reduced to that of a drug courier; he personally distributed commercial quantities of methamphetamine to a source on multiple occasions prior to this offense.

Further, the defendant committed this offense in May 2025 while on a criminal justice sentence in Multnomah County Circuit Court case 25CR10167 (Driving Under the Influence of Intoxicants). PSR ¶ 45. That supervision did not deter him at all from continuing to engage in criminal behavior, let alone the extremely dangerous behavior of dealing in large quantities of dangerous drugs.

A sentence above the mandatory minimum is also necessary to afford adequate deterrence, generally, to criminal conduct—that even if there is no prior drug trafficking criminal behavior, transporting and trafficking such a massive amount of drugs will result in a lengthy prison sentence.

The defendant appears to need substance abuse, specifically alcohol, treatment, which he seems to recognize. A sentence of imprisonment could provide the defendant with corrective treatment. However, it is unclear what, if any, role the defendant's alcohol use played in his offense of possessing with intent to distribute large quantities of methamphetamine. There is no indication that the defendant was under the influence of alcohol when he was arrested on May 24, 2025, or when he sold a government source methamphetamine on three separate occasions prior to his arrest. Further, the defendant previously had the opportunity to engage in treatment in 2017 as part of a DUI Diversion Program. That treatment did not prevent the defendant from later engaging in drug dealing in this offense, nor from continued substance abuse, as evidenced by his 2025 DUI conviction.

A sentence of 210 months' imprisonment is the most appropriate sentence. The reduction for acceptance of responsibility and the downward variance as laid out by the government properly account for the sentencing factors outlined in 18 U.S.C. § 3553(a); the defendant should not receive any further reductions to his sentencing guidelines range. The defendant, after conducting multiple transactions of commercial quantities of drugs, was stopped with approximately 270 pounds of methamphetamine—one of the largest seizures in the history of the Multnomah County SIU. When arrested, he was on supervision for another crime. The defendant resupplied himself at least three times prior that same year. This continued pattern of transporting and dealing a dangerous drug, one of the most serious threats to the community of Oregon per law enforcement, is not properly accounted for by a sentence below the advisory guidelines, let alone the mandatory minimum. While the mandatory minimum of 120 months' imprisonment is not a short sentence by any means, it is not appropriate here when considering all the § 3553(a) factors.

**E. Forfeiture**

Defendant agreed to forfeit all rights, title and interest in all assets which are subject to forfeiture pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. 2461(C), including $2860 in U.S. currency and four (4) counterfeit gold bars. A Preliminary and Final Order of Forfeiture was filed for the $2860 in U.S. currency and four (4) counterfeit gold bars on March 11, 2026.

**Conclusion**

Based on the foregoing, the government recommends that this Court impose a sentence of 210 months, followed by a five (5) year term of supervised release, subject to the standard conditions. Such a sentence promotes respect for the law, acts as a deterrent, and provides just punishment for the offense. Most importantly, this sentence would protect the community from this offender for the foreseeable future.

Dated: August 5, 2026

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

*/s/ Jessica R. Keefer*
JESSICA R. KEEFER, MSB #1412180261
Assistant United States Attorney